IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA          :
                                                        :
                        v.                               :          CRIMINAL ACTION FILE
                                                        :          NO: 2:09-CR-0016-WCO-SSC
VICTOR DOOLEY                          :

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND
ORDER CERTIFYING CASE READY FOR TRIAL**

Before the court is Defendant's Motion to Suppress Illegally Seized Evidence [Doc. 84]. For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

**Procedural History**

In an indictment filed April 7, 2009 [Doc. 6], Defendant was charged with knowingly possessing a destructive device that "was not registered to him in the National Firearms Registration and Transfer Record," in violation of 26 U.S.C. §§ 5861(d) and 5871. On May 8, 2009, Defendant filed motions to suppress evidence seized by law enforcement officers and statements made by Defendant on March 27, 2009 [Docs. 16 & 17], and those motions were denied on January 22, 2010 [Doc. 54]. Defendant's trial was eventually scheduled, after multiple continuances, for July 6, 2010. (See Doc. 59). Defendant did not appear for trial.

1

(See Doc. 71).   According to the Minute Sheet for the proceedings on that date, Defendant called and told the District Judge's courtroom deputy "that he thought he had had a stroke and was going to see his doctor and would not be present for Court . . . ." [Doc. 71].   The District Judge revoked Defendant's bond and issued an arrest warrant. (Id.).

Defendant was arrested on that warrant that same day, July 6, 2010.  [Doc. 77].   In a superseding indictment filed July 13, 2010 [Doc. 72], Defendant  is charged with knowingly possessing a destructive device that "was not registered to him in the National Firearms Registration and Transfer Record," in violation of 26 U.S.C. §§ 5861(d) and 5871 (Count One) and knowingly and willfully failing to appear for trial on July 6, 2010, in violation of 18 U.S.C. § 3146(a)(1) (Count Two).

Defendant filed the instant motion to suppress [Doc. 84], seeking to suppress evidence seized from Defendant's residence and truck on July 6, 2010. The court conducted a hearing on Defendant's motion on October 5, 2010 (see Doc. 89), and a transcript of the hearing has been filed [Doc. 94].  Defendant filed a post-hearing brief [Doc. 106], in which he continues to challenge the search of his residence, but he "makes no argument regarding suppression of the articles in his truck." (Doc. 106, Def. Br. at 1).   The Government filed a response in opposition to Defendant's motion on December 24, 2010 [Doc.  109];  Defendant did not file a reply.

Because Defendant appears to have withdrawn or at least abandoned his motion to suppress evidence seized from his truck, it is **RECOMMENDED** that Defendant's motion to suppress evidence seized from his truck be **DENIED** for purposes of the instant prosecution.[1]

### **Finding of Facts**[2]

During the hearing on Defendant's motions to suppress, the Government presented the testimony of Monte Sharitt, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and Eugene Fleming, a Special Agent with the ATF.  (Tr. 5-6, 64).

On July 6, 2010, after the District Court issued a bench warrant for Defendant's arrest for failure to appear for his trial, five agents, including three ATF agents and two Marshals, went to Defendant's known address at 40 Smokey Trail, Crawford, Georgia, but he was not there.  (Tr. 6-9, 11).  A handwritten note taped to the door stated that Defendant and his wife were out of town for a family emergency, and it provided Defendant's cell phone number.  (Tr. 9-10; see also Gov't Exs. 2 & 4).  A neighbor told one of the agents that Defendant had left that morning.  (Tr. 10).

---

[1] During the hearing on the instant motion to suppress, the Assistant United States Attorney indicated that Defendant may face prosecution in the Southern District of Georgia, where the truck search and seizure of items from the truck occurred.  (Tr. 4).

[2] These facts are taken from the testimony and exhibits presented during the October 5, 2010 hearing on the pending motion.  References to the transcript are designated as "Tr. __".

The agents then proceeded to an address in Greensboro, Georgia associated with Defendant and his wife.  (Tr. 11-12).  As the agents arrived, "multiple females" exited the house.  (Tr. 12).  The agents introduced themselves, and Defendant's wife identified herself as "Susan Dooley."  (Id.).  Agents asked the women if Defendant was present in the house, and they all said "no."  (Id.).  Mrs. Dooley informed the agents that the house was not her residence; the house belonged to Mrs. Dooley's mother, who was also present.  (Tr. 12).  Agent Sharitt asked the women (Mrs. Dooley and her mother) if the agents could look inside the house to confirm that Defendant was not present, and they agreed.  (Tr. 12, 16). The agents performed a "brief security sweep of the residence" to look for Defendant, but he was not present.  (Tr. 16).

The agents then questioned Mrs. Dooley and her mother about Defendant's location and his "frame of mind." (Tr. 17).  Mrs. Dooley indicated "that she had heard from her husband earlier that day," and that he had "left a message with a neighbor to tell Mrs. Dooley . . . that he loved her, he was leaving, along those lines."  (Id.).  Mrs. Dooley also reported "that she was in fear for her safety, that [Defendant] may hurt her" and "may hurt law enforcement," and that he "had made statements to her that he had a hundred places to hide . . . ."  (Id.).

Agent Sharitt asked Mrs. Dooley about the note left on the door at 40 Smokey Trail, and she stated that Defendant "commonly put signs like that up,

even though he may be inside the residence . . .  so people will leave him alone."
(Tr. 19).  She also stated that during a phone call with Defendant earlier that
morning, Defendant told her that he thought he had had a stroke, and when she
offered to take him to a medical facility, he responded, "if you come home, be
prepared to disappear," or words to that effect.  (Id.).  She also stated "that she did
not know of any firearms being located at the residence post his release for the
offense in this case, but she did [state] that she would be glad to show [the agents]
where [Defendant] commonly stored or hid his firearms throughout his residence
. . . ."  (Id.).  Sharitt "asked her if she had any problems with [the agents]
searching her residence, [Defendant's], their marriage residence that they
maintained in Crawford, Georgia," i.e., 40 Smokey Trail.  (Id.).  Mrs. Dooley "said
she did not have any problem with that."  (Id.).  Sharitt confirmed that she was
still married to Defendant and that she had not "in any form or fashion been
kicked out of the house." (Tr. 22-23).  She informed Sharitt that "she did not have
any reason she would not be allowed there."  (Tr. 23).  She was at her mother's
house that day simply because her mother was sick, but she had been at the
marital residence one to two weeks prior with Defendant.  (Tr. 23, 54-55).

As Mrs. Dooley spoke with the agents, she was "cooperative," and she "was
actually responsive on the questions about what times calls were received, when
she received them," and she even went through her phone call logs.  (Tr. 18).

According to Agent Sharitt, "Mrs. Dooley never seemed bothered by our presence. If anything, she was appreciative.  She seemed very concerned for [Defendant] out of a fear that any wife would have for their husband."  (Id.).

Sharitt asked Mrs. Dooley if the agents could follow her to the Smokey Trail location, and she agreed.  (Tr. 20).  Mrs. Dooley rode with other friends or relatives to the Smokey Trail residence.  (Tr. 20).  The agents followed her, and on the way, they stopped at a gas station for fuel and then at a "dollar-type store" in order to meet an ATF bomb technician.  (Tr. 20-22).   They remained at the dollar store for approximately one hour waiting for the bomb technician, who was coming from Marietta, Georgia.  (Tr. 27).   During that time, Mrs. Dooley "was free to move about," and at one point she and her party left the area and then returned, and they went in and out of the dollar store.  (Tr. 21, 27).

It was also during that time that Mrs. Dooley executed a  "Consent to Search" form.  (Tr. 22; Gov't Ex. 3).  That form described the premises to be searched as "40 Smokey Trail Crawford, GA 30630 All outbuildings & main residence." (Gov't Ex. 3).  Although the consent form indicates that Mrs. Dooley provided a general consent to search, and no restrictions were placed on the search, according to Agent Sharitt, the consent was given to search for firearms and for Defendant.  (Tr. 33).  Sharitt confirmed that Mrs. Dooley can read and write, and she informed him that she graduated from high school and attended

some college and technical school.  (Tr. 23).  She indicated that she had some vision problems, and Shariff offered to read the consent form to her, but she "declined, saying she could read it herself as long as she could hold it close to her face, which she did."  (Id.).  She read the form, asked questions about it, and then initialed each statement on the form and signed it.  (Tr. 24; Gov't Ex. 3).  The bomb technician then asked her questions about the residence, and she provided a key and the alarm code.  (Tr. 25, 28).   During the process of providing her written consent to search, Mrs. Dooley's demeanor was "pleasant," and "[s]he seemed willing to help."  (Tr. 25).

When the five original agents arrived at the Smokey Trail residence for the second time that day, the bomb technician and another ATF agent joined them, as did two or three local deputies.  (Tr. 28).  The bomb technician initially made sure that it was safe to enter the home and gained access, and then the technician, Sharitt and another agent entered the house to look for explosive devices and secure the residence; they confirmed that no one, including Defendant, was inside.  (Tr. 28-30, 56).   Sharitt then escorted Mrs. Dooley into the residence.  (Tr. 28, 30).

Upon entry, Mrs. Dooley "began noticing items in the house that were missing," including a mattress from a front bedroom.  (Tr. 30).  Mrs. Dooley also pointed to locations in the master bedroom where Defendant hid guns, including the master bedroom closet, the night stand and a sofa, but no guns were found in those locations.  (Tr. 30, 58).  Mrs. Dooley also pointed to an empty armoire and

stated that Defendant's clothes were missing. (Tr. 32). While they were in the bedroom talking, one of the Deputy Marshals opened a dresser drawer and asked, "What's this?" (Tr. 31-33, 57-58). Sharitt "walked over to a drawer that was open and looked down and saw women's underwear and a card displayed." (Tr. 31). Sharitt asked Mrs. Dooley if they were her clothes, and she said they were. (Id.). Sharitt asked her about the card, and "she indicated it was nothing she had seen before and knew about." (Id.). Underneath the card was a photo, a handwritten letter and a check. (Id.; see also Gov't Exs. 5-9). Agent Fleming removed the items and "secured them for evidence." (Tr. 31).

While the agents were searching the house, Mrs. Dooley's demeanor was "pleasant," and she "seemed very helpful," "she was pointing out what's missing," and she was "attempting to show [Sharitt] where the firearms were." (Tr. 32). She did not seem nervous, just "concerned about her husband." (Tr. 35). She never tried to stop the agents during their search, she never told them not to open any drawers or closets, and she never told them to close drawers, cabinets or closets. (Tr. 34, 39, 63). The agents did not draw their weapons while they searched the residence. (Tr. 34-35). After the search was completed and the items referred to above were seized, Mrs. Dooley and her party and the agents left the residence.

(Tr. 38-39).[3]

## **Legal Analysis and Conclusions of Law**

Defendant argues that the warrantless search of the dresser drawer from

---

[3] The following facts pertain to the seizure of items from Defendant's truck that occurred later than day and although Defendant has abandoned any argument that the seizure was unlawful, the undersigned includes these facts for the benefit of the District Judge:

After they completed the search of the Smokey Trail residence, the agents received information from a cooperating witness that Defendant was in Wilkes County, in the Southern District of Georgia, and that Defendant had firearms and swords in his truck. (Tr. 39-40, 65-66). After Defendant left the cooperating witness's residence, a traffic stop was initiated, and Defendant was arrested. (Tr. 40, 66).

Agent Fleming arrived at the scene of Defendant's arrest as Agent Sharitt had Defendant lying on the ground and was placing him under arrest. (Tr. 67, 75). Fleming walked to the driver's side door of Defendant's truck, which was open, and Fleming saw "the butt of a firearm and extended magazine sitting on the driver's seat of the vehicle." (Tr. 67, 69). The firearm was photographed, then removed from the vehicle and inventoried. (Tr. 68-70; see also Gov't Exs. 10 & 11). Fleming requested the assistance of an ATF explosives enforcement officer (otherwise referred to as a bomb technician) because Fleming "wanted to make sure [they] had officer safety," so AFT bomb technician Steve Shelly conducted the search of the vehicle. (Tr. 61-62, 71). Fleming explained that he was concerned because the ATF had previously arrested Defendant for violating federal explosives laws, and they "had received information from his wife that it's a possibility that he may do harm to law enforcement," and therefore, Fleming "wanted to make sure that officer safety c[a]me first before [they] went and did anything to the vehicle that was being driven by [Defendant]." (Tr. 71).

During Shelley's search, when he found "something that was in violation," he would call Fleming to photograph it before it was removed from the truck, and then after Fleming photographed it, Fleming would remove the item "and take it to where it was being inventoried." (Tr. 72). A total of 34 firearms, the majority of which were loaded, were removed from the cab and bed of the truck. (Id.). Fleming testified that the firearms "were not legal for [Defendant] to possess because there was a court order . . . advising him that he was not to possess firearms" and because Defendant was under federal indictment for a felony offense. (Tr. 80; see also Docs. 4, 6). The agents also seized approximately 5,000 rounds of ammunition. (Tr. 72). The seized firearms and ammunition were logged into evidence and placed in the ATF vault. (Tr. 73). Defendant also "had various hatchets, knives and swords in the vehicle." (Id.). Those items "weren't in violation," so they were placed back into the truck after the inventory was complete, and the truck was impounded and towed to the Wilkes County Sheriff's Office impound lot. (Id.). The agents also found food and equipment indicating an intention "to stay for an extended time" at a location, including cold weather gear, a mattress, gallons of water and orange juice, canned goods and medicines, which were placed back in the vehicle. (Tr. 74-75). A passport was seized and taken into evidence, but money and a wallet were returned to Defendant's father. (Tr. 74).

which items were seized violated the Fourth Amendment because it exceeded the scope of the consent given by Defendant's wife, and therefore, the seized items must be suppressed.  (Doc. 108, Def. Br. at 5-6).  The Government argues that the seizure of the items from the dresser drawer was authorized by Mrs. Dooley's consent, and that the search did not exceed the scope of that consent.  (Doc. 109, Def. Br. at 7).

**A.     <u>Applicable Standards</u>**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by law enforcement officers or agents and further provides that "no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  "A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law." <u>United States v. Campbell</u>, 920 F.2d 793, 795 (11th Cir. 1991). "Upon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." <u>United States v. Freire</u>, 710 F.2d 1515, 1519 (11th Cir. 1983)(citation omitted), <u>cert.</u>

denied, 465 U.S. 1023 (1984); see United States v. Matlock, 415 U.S. 164, 177 n.14 (1974)("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). Thus, the Government must prove by a preponderance of the evidence that the warrantless search of the dresser drawer fell within one of the "recognized exceptions to the warrant requirement . . . ."

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "A consent search does not violate the Fourth Amendment 'because it is . . . reasonable for the police to conduct a search once they have been permitted to do so.' " United States v. Megahed, No. 8:07-cr-342-T23-MAP, 2009 U.S. Dist. LEXIS 24441, at *6 (M.D. Fla. Mar. 18, 2009) (quoting Florida v. Jimeno, 500 U.S. 248, 250-51 (1991)). When the Government attempts to justify a warrantless search on the ground that it was conducted pursuant to voluntary consent, the Government must prove the voluntariness of the consent.  United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984).

**B.    Authority to Consent to Search**

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third

party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." <u>Matlock</u>, 415 U.S. at 171.  The Court in <u>Matlock</u> explained that:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

<u>Id.</u> at 171-72 n.7.

If the third party does not have actual authority to consent, he or she must have at least apparent authority to consent to the search.   See <u>United States v. Scrushy</u>, No. CR-03-BE-0530-S, 2005 U.S. Dist. LEXIS 42842, at *20 (N.D. Ala. Jan. 20, 2005) ("[T]he third-party must have actual or apparent authority to consent to the search.").   With respect to apparent authority, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no *Fourth Amendment* violation if an officer has an objectively reasonable, though mistaken, good-faith belief that . . . he has obtained valid consent to search the area." <u>United States v. Brazel</u>, 102 F.3d 1120, 1148 (11th Cir.) (citing <u>Illinois v. Rodriguez</u>, 497 U.S. 177 (1990)), <u>cert. denied</u>, 522 U.S. 822 (1997); <u>see also</u> <u>United States v. Fernandez</u>, 58 F.3d 593, 597 (11th Cir. 1995) ("The Supreme Court has held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed

common authority over the premises, even if the third party does not in fact possess such authority." (citing <u>Illinois v. Rodriguez</u>)).

The undersigned finds that the Government has proven by a preponderance of the evidence that Mrs. Dooley had actual authority to consent to search of the residence she shared with Defendant, her husband, and to consent to search of the master bedroom.  She informed Agent Sharitt that she lived in the residence with her husband and that "she did not have any reason she would not be allowed there" (Tr. 22-23); she gave her verbal consent, and she signed a consent form authorizing the search (Tr. 19, 22; Gov't Ex. 3); and she provided the key and the alarm code to the house.  (Tr. 25).  No evidence was presented that calls into question Mrs. Dooley's actual authority to consent to the search of the house or the master bedroom.

Furthermore, even if she did not have actual authority, she clearly had apparent authority to consent, based on the same evidence that supports a finding of actual authority.  That evidence would "warrant a man of reasonable caution in the belief" that Mrs. Dooley had authority over the areas to be searched.  <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. at 188 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 21-22 (1968)).

## C.   <u>Voluntariness of Consent</u>

The undersigned further finds that the Government has proven by a

preponderance of the evidence that Mrs. Dooley did in fact consent to the search of Defendant's residence, including the areas searched within the master bedroom, and that her consent was voluntarily given.  Consent to a search is voluntary only if it is "the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360.  In Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973), the Supreme Court made clear that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." Chemaly, 741 F.2d at 1352 (quoting United States v. Phillips, 664 F.2d 971, 1023-24 (5th Cir. 1981)(Unit B), cert. denied, 457 U.S. 1136 (1982)); see also United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996).  In Gonzalez, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' " 71 F.3d at 828 (quoting Bumper v.

North Carolina, 391 U.S. 543, 550 (1968)).

In this case, Mrs. Dooley, who has attended college and can read and write, both verbally consented to a search of Defendant's residence, and signed a consent to search form which stated, among other things, that she understood she could refuse to consent to the search, that she understood she could withdraw her consent, and that the "consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsover." (Gov't Ex. 3).  There is no evidence that she was threatened or restrained, or that her consent resulted from duress or coercion.  Under these circumstances, the undersigned finds that Mrs. Dooley's consent was voluntarily given.

**D.    Scope of Consent**

Finally, the undersigned finds that the Government has met its burden of proving that the areas searched were within the scope of the consent given by Mrs. Dooley.  "A search may be unreasonable, even when an individual consents to that search, 'when an officer does not conform to the limitations imposed by the person giving consent.'" United States v. Baptiste, 388 F. App'x 876, 881 (11th Cir. 2010) (unpublished decision) (quoting United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999)).  "When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search 'is constrained by

the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.' " Zapata, 180 F.3d at 1243 (quoting United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990)).  "To ascertain what conduct is within the 'bounds of reasonableness,' we must consider what the parties knew to be the object (or objects) of the search." Id.  "A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items." Id.

In this case, the consent to search form authorized the search of the property at 40 Smokey Trail, Crawford, Georgia, including "All outbuildings & main residence," and there are no limitations on the scope of the permissible search stated on that form.  (Gov't Ex. 3).  Rather, the form states that Mrs. Dooley "hereby authorize[s] [ATF agents] to conduct a complete search of the property described below," i.e., the outbuildings and residence at 40 Smokey Trail, Crawford, Georgia.  (Id.).  However, because Agent Sharitt testified that Mrs. Dooley specifically gave her verbal consent to search the residence for Defendant and for firearms  (Tr. 33), the undersigned finds that the permissible scope of the search was any place within the residence or outbuildings at 40 Smokey Trail, Crawford, Georgia where Defendant could be located or where firearms could be kept.

Defendant argues that the permissible scope of the search was more limited,

however: "the object of the search was to find Mr. Dooley–nothing else." (Doc. 106, Def. Br. at 5). That assertion is clearly incorrect given Agent Sharitt's testimony, which the undersigned credits, that Mrs. Dooley consented to the search of her residence for firearms and for Defendant. (Tr. 33). There is no evidence to the contrary.

Defendant further contends that "[w]hile the agents wanted Mrs. Dooley to show them areas where Mr. Dooley had previously stored guns, such a request is for her to show, not for them to search." (Id.). That contention is without merit. Although Mrs. Dooley told agents that she would show them where Defendant "commonly stored or hid firearms throughout his residence" (Tr. 19), nothing in the record indicates that by offering such assistance, Mrs. Dooley intended to limit, or did limit, her consent to search to only those areas she specifically identified. In fact, Agent Sharitt testified that it was after Mrs. Dooley made the offer to show agents where Defendant had stored guns that he asked her if they could search the residence, and she consented. (Tr. 19). Agent Sharitt did not ask Mrs. Dooley for permission to search only those parts of the residence that she identified as having been used to store guns, nor did Mrs. Dooley indicate that her consent was limited "to show, not for them to search," as argued by Defendant. Rather, Sharitt asked for consent to search the residence, and Mrs. Dooley gave it.

17

Moreover, Mrs. Dooley never indicated that her consent was limited to the areas she identified, nor did she object to the agents searching other areas or withdraw her consent. (Tr. 34, 39, 63). Mrs. Dooley consented to a search of the residence for the defendant, and for firearms; thus the scope of her consent included those places where firearms could reasonably be located, such as drawers, particularly in a room where Mrs. Dooley indicated that Plaintiff had kept guns.

Accordingly, the undersigned finds that the Government has met its burden of proving that: Mrs. Dooley had actual (or at least apparent) authority to consent to the search of Defendant's residence, including the master bedroom and places therein where firearms could be kept; she did in fact consent to such a search, both verbally and in writing; her consent was freely and voluntarily given; and the law enforcement agents did not exceed the scope of Mrs. Dooley's consent by opening the dresser drawer in the master bedroom. Therefore, it is **RECOMMENDED** that Defendant's motion to suppress the items seized from his residence on July 6, 2010 be **DENIED**.

<u>**Conclusion**</u>

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's motion to suppress [Doc. 84] be **DENIED**.

**IT IS FURTHER ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate

18

Judge, this case is **CERTIFIED READY FOR TRIAL**.

      **IT IS SO REPORTED, RECOMMENDED, and ORDERED** this 24th day of

January, 2011.


*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge

19